17-3218-cv
Klein v. Cadian Capital Mgmt., LP

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: May 14, 2018　　　　　　　Decided: October 2, 2018)

Docket No. 17-3218-cv

_____

TERRY KLEIN, derivatively on behalf of QLIK TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

v.

QLIK TECHNOLOGIES, INC.,

*Defendant-Appellant,*

v.

CADIAN CAPITAL MANAGEMENT, LP, CADIAN FUND LP, CADIAN
MASTER FUND LP, CADIAN GP, LLC, CADIAN CAPITAL MANAGEMENT
GP, LLC, ERIC BANNASCH,

*Defendants-Appellees.*

_____

Before:  POOLER, LOHIER, *Circuit Judges*, and SULLIVAN, *District Judge*.[1]

Appellant Terry Klein brought this suit derivatively as a shareholder of Qlik Companies. She alleges that Appellees, referred to collectively as the "Cadian Group," owned more than ten percent of Qlik and engaged in short-swing transactions in that stock in 2014, in violation of Section 16(b) of the Securities Exchange Act. While the action was stayed for reasons irrelevant to this appeal, Qlik was bought out in an all-cash merger, causing Klein to lose any financial interest in the litigation. After the stay was lifted, the Cadian Group moved to dismiss the action for lack of standing. Klein moved to substitute Qlik under Rule 17(a)(3) of the Federal Rules of Civil Procedure. The District Court for the Southern District of New York (Ramos, *J.*) found that Klein's lack of standing deprived it of jurisdiction to do anything other than dismiss the suit and that, in any case, Qlik could not be substituted under Rule 17 because it had not made an "honest mistake" when it failed to join the action earlier. We disagree. When Klein lost her personal stake in the litigation, the only jurisdictional question was whether the case had become moot. A district court has jurisdiction to determine

---

[1] Judge Richard J. Sullivan, United States District Court for the Southern District of New York, sitting by designation.

whether substituting a plaintiff would avoid mooting the action. Rule 17(a)(3) allows substitution of the real party in interest so long as doing so does not change the substance of the action and does not reflect bad faith from the plaintiffs or unfairness to the defendants. There is no "honest mistake" requirement beyond that. The district court should have substituted Qlik and denied the Cadian Group's motion to dismiss for lack of jurisdiction.

Vacated and remanded.


JUDGE RAYMOND J. LOHIER, JR. dissents in a separate opinion.

_____

PAUL DENNIS WEXLER (Glenn F. Ostrager, *on the brief*), New York, N.Y., *for Appellants*.

JAMES E. TYSSE, Akin Gump Strauss Hauer & Feld LLP (Z.W. Julius Chen, Douglas A. Rappaport, Robert H. Pees, Jessica Oliff Daly, *on the brief*), Washington, D.C. *for Appellees*.

POOLER, *Circuit Judge*:

Appellant Terry Klein brought this suit derivatively as a shareholder of Qlik Companies. She alleges that Appellees, referred to collectively as the "Cadian Group," owned more than ten percent of Qlik and engaged in "short-swing" transactions in that stock in 2014, in violation of Section 16(b) of the Securities Exchange Act. While the action was stayed for reasons irrelevant to this appeal, Qlik was bought out in an all-cash merger, causing Klein to lose any financial interest in the litigation. After the stay was lifted, the Cadian Group moved to dismiss the action for lack of standing. Klein moved to substitute Qlik under Rule 17(a)(3) of the Federal Rules of Civil Procedure. The District Court for the Southern District of New York (Ramos, *J.*) found that Klein's lack of standing deprived it of jurisdiction to do anything other than dismiss the suit and that, in any case, Qlik could not be substituted under Rule 17 because it had not made an "honest mistake" when it failed to join the action earlier.

We disagree. Klein's personal stake at the outset of the litigation established her standing. When she lost her personal stake as the action proceeded, the only jurisdictional question was whether the case had become moot. A district court determining whether a case has become moot maintains

4

jurisdiction to determine whether a substitute plaintiff would avoid that result. Rule 17(a)(3) allows substitution of the real party in interest so long as doing so does not change the substance of the action and does not reflect bad faith from the plaintiffs or unfairness to the defendants. There is no "honest mistake" requirement beyond that. The district court should have substituted Qlik and denied the Cadian Group's motion to dismiss for lack of jurisdiction.

Accordingly, we VACATE the district court's dismissal of the action for lack of subject matter jurisdiction and REMAND for substitution of Qlik and further proceedings consistent with this opinion.

## BACKGROUND

Section 16(b) of the Securities Exchange Act requires corporate insiders, including owners of more than ten percent of a company's stock, to disgorge what are colloquially known as "short-swing profits," i.e., any profits made from buying and selling or selling and buying within a six-month period a security based on that company's stock. 15 U.S.C. § 78p(b). The statute imposes strict liability on insiders likely to have access to insider information in order to "tak[e] the profits out of a class of transactions in which the possibility of abuse was believed [by the Congress that passed it] to be intolerably great." *Reliance Elec.*

*Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). Suits under 16(b) can be brought by the company that issues the relevant stock or, "if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter," by any "owner of any security of the issuer." 15 U.S.C. § 78p(b).

The Cadian Group allegedly owned more than ten percent of Qlik and engaged in short-swing transactions in that stock in 2014. Klein purchased some of Qlik's stock and made demand on Qlik on June 11, 2015. Qlik informed Klein that it did not intend to bring an action, so Klein filed a complaint against the Cadian Group on October 15.

The case was stayed on November 20 pending resolution of a motion in a related case brought by the same plaintiff's attorneys against the same group of defendants who apparently engaged in similar transactions with another company. In the meantime, a private equity company that is not a party to this matter bought out Qlik in an all-cash merger. The agreement was signed on June 2, 2016, and checks were cut to shareholders on August 22.

On November 11, 2016, the Cadian Group requested permission to file a motion to dismiss on the grounds that Klein no longer had standing after selling

her shares in the merger.[2] Four days later, Klein requested permission to file a motion to substitute Qlik (now under new ownership) under Rule 17(a)(3) of the Federal Rules of Civil Procedure. The district court granted the Cadian Group's motion to dismiss and denied Klein's motion to substitute. *Klein*, 2017 WL 4129639, at *11. The court reasoned that Klein's lack of continuing financial interest in the litigation caused her to lose standing, which made the case moot. *Id.* at *8. According to this logic, Klein's lack of standing rendered the court powerless to rule on her motion to substitute. The district court found in the alternative that Rule 17(a)(3) does not actually apply to this situation because Klein did not make an "honest mistake" in failing to include Qlik as a plaintiff ab initio. *Id.* at *10 & n.13. Klein and Qlik timely appealed.

**DISCUSSION**

The district court should not have hesitated to substitute Qlik. It has the constitutional power to substitute a real party in interest to avoid mooting a case and Rule 17(a)(3) is an appropriate procedural mechanism for doing so.

---

[2] The Cadian Group also argued that Klein did not have standing at the inception of the lawsuit, but the district court (correctly) rejected that argument and it is not at issue on appeal. *See Klein ex rel. Qlik Techs., Inc. v. Cadian Capital Mgmt., LP*, 15 Civ. 8140 (ER), 2017 WL 4129639, *5-6 (S.D.N.Y. Sept. 15, 2017).

## I.     The Jurisdictional Consequence of Klein's Loss of a Personal Stake

It is an elementary lemma of constitutional interpretation that Article III, Section 2 limits the power of federal courts to adjudicating "Cases" and "Controversies." In practice this means that the judicial power to articulate the law extends only to complaints from parties "seek[ing] redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In civil matters, federal courts will only hear from plaintiffs who clearly allege that one or more of a defendant's actions led to an "invasion of [the plaintiffs'] 'legally protected interest'" in a manner that makes it "likely that the injury will be redressed by a favorable decision." *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). We may, in short, only entertain complaints from a complainant with a concrete stake—and not just a "keen interest"—in the outcome of the litigation. *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013).

We have previously found that there is a case or controversy in a Section 16(b) case so long as the party bringing suit is either the corporation that issued the securities in question or a current security holder of that corporation. *See Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012). At this

8

stage of the litigation, nobody contests that Klein's interest in Qlik at the initiation of the suit and until the moment of the buyout was sufficient to empower the district court to hear her Section 16(b) action. The question in front of us is what that court has the power to do now that Klein no longer has any financial stake in Qlik.

The district court concluded that, once Klein was bought out, it lost all power to do anything but declare that it no longer had subject-matter jurisdiction. *Klein*, 2017 WL 4129639, at *10. It reasoned that a derivative plaintiff in a Section 16(b) action who loses her stake in the corporation thereby loses her standing to maintain the action, *id.*, which rendered "the only function remaining to the court . . . that of announcing [its lack of jurisdiction] and dismissing the cause."[3] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). According to the court below, "[w]hile it may be true that courts have distinguished between standing and mootness, the Supreme Court in analyzing whether a plaintiff would maintain some continuing

[3] Other district courts in this Circuit have analyzed similar cases similarly under the standing rubric. *See, e.g.*, *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *3-6 (S.D.N.Y. Oct. 12, 2012).

financial stake in a Section 16(b) litigation has indicated that the applicable doctrine is that of standing." *Klein*, 2017 WL 4129639, at *7 n.8 (internal quotation marks omitted).

Reviewing this determination de novo, we hold that it was erroneous. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015). ("On appeal from a dismissal under Rule 12(b)(1) [including on mootness grounds], we review the court's factual findings for clear error and its legal conclusions *de novo*."). The district court's interpretation of the relevant precedent is understandable given the sometimes-incautious way the word "standing" has been used, but it is mistaken nevertheless. The consequences of losing a stake in ongoing litigation are determined not by asking whether the party losing its stake in the litigation has lost its *standing* but by asking whether the action has become *moot*.

The case-or-controversy limitation on our jurisdiction, and its focus on parties' stakes in the action, manifests in three distinct legal inquiries: standing, mootness, and ripeness. Only the first two are at issue here. "[S]tanding doctrine evaluates a litigant's personal stake as of the outset of litigation." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) (quoting *Cook v. Colgate,* 992

F.2d 17, 19 (2d Cir. 1993)); *see also Lujan*, 504 U.S. at 569 n.4; *Gollust v. Mendell*, 501 U.S. 115, 124 (1991) (discussing Section 16(b) statutory standing as "limited only by conditions existing at the time an action is begun"). Mootness doctrine determines what to do "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation" after its initiation.[4] *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks omitted); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018).

For many years, however, the term "standing" was also used to more broadly connote "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." *Standing*, Black's Law Dictionary (10th ed. 2014). In other words, "standing" was sometimes used to refer to a particular Article III inquiry and sometimes, more informally, as a synonym for the personal stake in the litigation with which multiple areas of law concerns themselves. The more

---

[4] Ripeness doctrine, measured at the outset, is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" when it is not yet clear if or how a plaintiff has been injured. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation marks omitted); *see also Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 121-22 (2d Cir. 2014).

informal use of "standing" can be found in some of the cases the district court relied on.

*Gollust v. Mendell*, the leading case on who can sue under Section 16(b), repeatedly refers to the breadth of "standing." *See* 501 U.S. at 123-25. But the *Gollust* Court did not ask any constitutional questions; indeed, it avoided them. *See id.* at 125-26 (stating that had Congress drafted Section 16(b) more broadly, it would have raised "serious constitutional doubt," and relying on constitutional avoidance to avoid determining the constitutional question). It was concerned with a matter of statutory interpretation: to whom Section 16(b) provides a private cause of action. The "standing" it was discussing was what used to be called "statutory standing." The Supreme Court has since clarified that "what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). It is precisely "to avoid incorrectly portraying them as jurisdictional requirements" that we now avoid the term "statutory standing" when discussing the sorts of requirements found in Section 16(b) on which the

12

*Gollust* court focused. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018); *see also Am. Psychiatric Ass'n*, 821 F.3d at 359 ("Because the Supreme Court made clear in *Lexmark* that the 'statutory standing' appellation is 'misleading' and 'a misnomer,' we avoid this appellation going forward."(citation omitted) (quoting *Lexmark*, 572 U.S. at 127-28 & n.4)). If *Gollust* had been written after the 2014 *Lexmark* decision, it would surely not have used "standing" in describing the object of its analysis.

An infelicitous phrasing in one of this Circuit's cases adds to the confusion. In *Altman*, we reaffirmed the principle that while "standing doctrine evaluates a litigant's personal stake as of the outset of the litigation, the mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit." 245 F.3d at 70 (internal quotation marks omitted). Just before we did so, however, we seemed to conflate the two doctrines, saying "if the plaintiff loses standing at any time during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot." *Id.* at 69. This is another instance of "standing" being used to mean something other than the constitutional minimum a party must establish at the onset of a case. It is

13

"standing" not in its constitutional sense, but as a stand-in for "personal stake in the litigation."

These terminological distinctions may seem mere taxonomic fussiness. But the standing and mootness inquiries "differ in respects critical to the proper resolution of" cases like this one. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often . . . for years." *Id.* at 191. Thus, "[t]o abandon the case at an advanced stage may prove more wasteful than frugal." *Id.* at 191-92. It may also prove prejudicial to non-parties who forewent filing a separate suit on the same issues in reliance on the outcome of the suit already brought. And it may enable defendants to game the judicial system by providing some sort of ephemeral relief to named plaintiffs to avoid the risk of more substantial relief being awarded to other real parties in interest.

The difference between mootness and standing has been most evident in class action jurisprudence. Named plaintiffs in class litigation represent not just—or even primarily—themselves, but also those sufficiently similarly

14

situated that Rule 23 enables judicial recognition of their shared interest.

Members of a class who are not named plaintiffs (and do not opt out) will be bound by the result of the litigation. It is well established that their interest in the outcome should not be ignored when circumstances deprive the party that represents them of her interest. *See Sanchez-Gomez*, 138 S. Ct. at 1538 ("The certification of a suit as a class action has important consequences for the unnamed members of the class . . . [as] [t]hose class members may be bound by the judgment and are considered parties to the litigation in many important respects." (internal quotation marks omitted)). Accordingly, "[s]ubstitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons" that would deprive them of standing if present at the outset of litigation "is a common and normally an unexceptionable . . . feature of class action litigation . . . in the federal courts." *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006); *see also Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003) (distinguishing between cases where standing was lacking ab initio, where immediate dismissal is required, and where a mootness issue arises, where "substitution or intervention might [be] possible"); *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976) (allowing for such

substitution in a prisoner litigation case). *But see Symczyk*, 569 U.S. at 73-74 (distinguishing collective actions under the Fair Labor Standards Act from Rule 23 class actions for mootness purposes). Moreover, though a class technically does not exist before it has been certified, "where the class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy." *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993); *see also Phillips*, 435 F.3d at 787 ("Strictly speaking, if no motion to certify has been filed (perhaps if it has been filed but not acted on), the case is not yet a class action and so a dismissal of the named plaintiffs' claims should end the case . . . [b]ut the courts . . . are not so strict."). The Supreme Court has allowed the United States to step in as a plaintiff when statutorily permitted "despite the disappearance of the original plaintiffs and the absence of any class certification." *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-31 (1976). And substitution of a plaintiff whose individual claim has not been mooted is not even always necessary after class certification unless there is reason to believe that the class representative will no longer meet the requirements of Rule 23. *See, e.g., Turkmen v. Ashcroft*, 589 F.3d 542, 545-46 (2d Cir. 2009).

16

The Seventh Circuit has described these situations as "disregard[ing] the jurisdictional void that is created when the named plaintiffs' claims are dismissed." *Phillips*, 435 F.3d at 787. But one might more accurately say that there is no jurisdictional void to disregard. A legal controversy is not like an electrical circuit, such that a court's power switches off as soon as the personal stake of all of the named parties on either side of the controversy drops below the legally adequate threshold. Rather, Rule 17 contemplates that federal courts maintain jurisdiction over an action in which a representative plaintiff has lost her stake long enough to determine whether the concrete adverseness that existed at the outset of the case can be maintained without undue prejudice to defendants. Only if the answer is "no" is there no longer a live case in front of the court. And only then must a court dismiss the matter for want of jurisdiction.

The dissent argues that recent Supreme Court precedent establishes that this "more relaxed rule of mootness" applies "exclusively to class actions." Dissent at 2. With all due respect, this is an overreading of the relevant precedent. In *Symczyk*, the Supreme Court held only that a plaintiff-employee who brings a proposed collective action under the Fair Labor Standards Act and whose individual claim is mooted before any of her fellow employees opt into

the action may not be replaced with another plaintiff-employee to avoid mooting the action. *See* 569 U.S. at 73-76. The Court reasoned that, unlike in a Rule 23 class action, a FLSA collective action "does not produce a class with an independent legal status" before other employees opt into the action. *Id.* at 75. In *Sanchez-Gomez*, the Supreme Court rejected a flexible mootness inquiry in a criminal case that did "not involve *any* formal mechanism for aggregating claims," not even one "comparable to the FLSA collective action." 138 S. Ct. at 1539.

What *Symczyk* and *Sanchez-Gomez* teach is that whether the interests of non-named interested parties are to be considered in determining whether to dismiss a case as moot depends on whether those parties have a "legal status separate from the interest asserted by the named plaintiff." *Id.* at 1538 (quoting *Symczyk*, 569 U.S. at 74). And whether non-named parties have that status "turn[s] on the particular traits" of the action in front of the court. *Id.* Ours is not the easy question of whether a derivative action is a class action or not but the harder question of whether a derivative action is like a class action in the relevant ways.

We think it is. Like a class action—but unlike a pre-certification FLSA collective action as understood by the Supreme Court—a derivative action

18

involves a representative plaintiff. Under both Rule 23, governing class actions, and Rule 23.1, governing derivative actions, a plaintiff seeking to bring suit must establish that the Federal Rules allow her to formally represent the interests of others. Fed. R. Civ. P. 23, 23.1. A derivative action, like a class action, is thus "an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Sanchez-Gomez*, 138 S. Ct. at 1538 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A corporation is "bound by the judgment" of derivative litigation brought on its behalf and is "considered [a] part[y] to the litigation in many important respects." *Id.* Since the dissent does not deny these analogies, we are not persuaded by its assertion that a derivative action is "even further afield" from class actions than FLSA collective actions. Dissent at 3.

We also note that mootness doctrine counsels suspicion in situations in which a defendant deprives a plaintiff of her stake in the litigation. For instance, when a plaintiff seeks an injunction, a defendant who voluntarily ceases the challenged behavior calls into question whether there is any way to redress the injury alleged. A rigid view of mootness would dismiss such an action. But it is well settled that "a defendant's voluntary cessation of a challenged practice does

not deprive a federal court of its power to determine the legality of the practice." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). To prevent a defendant from strategically pausing their wrongdoing, getting a case dismissed as moot, and then beginning it again after the suit ends (potentially resulting in a new suit), federal law places the burden on the *defendant* who has voluntarily ceased her wrongdoing to prove that mootness should result. Such a defendant has "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. at 190, and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation,"[5] *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002) (internal quotation marks omitted). Similarly, a defendant to a class action may not moot a case simply by offering a settlement equivalent to the full potential value of the individual claims of class representatives. *See Campbell-Ewald Co. v. Gomez*, 136 S.

---

[5] Moreover, dismissing a case as moot because a defendant has voluntarily ceased behavior that allegedly violates a plaintiff's rights is a discretionary matter. *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012).

Ct. 663, 670-71 (2016). *But see Symczyk*, 569 U.S. at 72-73 (leaving open whether this rule applies to FLSA actions).

There is no evidence of any skullduggery in this case, but the rule we announce today will surely apply to cases where there has been. Dismissing Klein's claim without further inquiry would leave us powerless to address a defendant's attempt to avoid liability by buying out derivative plaintiffs in future cases. And strategic buyouts are not unheard of in the Section 16(b) context. Take *Gollust* itself for instance. Before that case made it to the Supreme Court, it passed through this Circuit. *See Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724 (2d Cir. 1990). While "we decline[d]—in keeping with §16(b)'s objective analysis regarding defendants' intent—to inquire whether the merger was orchestrated for the express purpose of divesting plaintiff of standing," we could not "help but note that the . . . merger proposal occurred after plaintiff's § 16(b) claim was instituted," which made "the danger of such intentional restructuring to defeat the enforcement mechanism incorporated in the statute . . . clearly present." *Id.* at 731. We observed that "a rule that allows insiders to avoid § 16(b) liability by divesting public shareholders of their cause of action through a business reorganization would undercut the function Congress planned to have

21

shareholders play in policing such actions." *Id.* The Supreme Court quoted this observation with approval in announcing its interpretation of Section 16(b). *See Gollust*, 501 U.S. at 120 n.5. Today we observe, in parallel fashion, that a mootness doctrine that allows those accused of securities fraud to have a suit promptly dismissed by buying out a derivative plaintiff would undercut the purpose of derivative litigation under Rule 23.1 as well as courts' constitutional function of resolving genuine disputes.

Thus, while the district court is correct that Klein lost her personal stake in the litigation, it is incorrect that it has no ability to consider Klein's motion to substitute Qlik.[6] Unlike a federal court presented with a plaintiff who has no standing, a federal court considering whether a case has become moot already has jurisdiction over that case. When a representative plaintiff's ongoing stake in the outcome is at issue, a federal court maintains its jurisdiction at least long enough to determine whether the represented parties maintain an interest and

---

[6] Both Section 16(b) and Rule 23.1 require a continuing financial interest. Because the nature of the injury for constitutional purposes is in part delimited by the law underlying the claim in question, we need not determine whether a statute or federal rule that enabled Klein to maintain an action despite her loss of a financial interest in Qlik would run into constitutional problems.

22

whether a substitution could avoid mootness. So long as a proposed substitution does not "come[] long after the claims of the named plaintiff[] were dismissed" and does not alter the substance of the action, it should be considered as an alternative to dismissal. *Phillips*, 435 F.3d at 787.

## II. Substituting Qlik under Rule 17(a)(3)

Klein's proposed procedural route to substitution is Rule 17(a)(3) of the Federal Rules of Civil Procedure. That Rule prohibits federal courts from dismissing a case "for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). "Crucially for statute of limitations purposes, the claim of the [substituted] real party in interest . . . dates back to the filing of the complaint." *Cortlandt*, 790 F.3d at 421. Qlik, the issuer of the securities at issue, is the real party in interest in this derivative litigation. *See Donoghue*, 696 F.3d at 176 & n.5.

The district court ruled that "[e]ven if [it] had standing to entertain [Klein's] motion, the motion would fail," because Rule 17(a) only allows substitution when there has been an "honest mistake in selecting the proper party," and Qlik's conscious decision not to litigate this action is not an "honest

23

mistake." *Klein*, 2017 WL 4129639, at *10 n.13. This determination was based on an error of law, and thus constituted an abuse of the district court's discretion. *See Cortlandt*, 790 F.3d at 417 ("A district court's decision whether to dismiss pursuant to Rule 17(a) is reviewed for abuse of discretion." (internal quotation marks omitted)).

In this Circuit, "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997). Even if a proposed substitution meets these requirements, it should be denied if it is being proposed "in bad faith or in an effort to deceive or prejudice the defendants." *Id.* at 21. A court may also deny a Rule 17(a) substitution if doing so would otherwise result in "unfairness to defendants." *Id.* In sum, "[a]lthough the district court retains some discretion to dismiss an action where there was no semblance of any reasonable basis for the naming of an incorrect party, there plainly should be no dismissal where substitution of the real party in interest is necessary to avoid injustice." *Id.* at 20 (citation and internal quotation marks omitted).

24

Klein's proposed substitution of Qlik would alter none of the factual allegations of the complaint. And there is no evidence that either Qlik or Klein are acting or have acted in bad faith. As far as the record shows, both Qlik and Klein honestly expected, based on the information they had at the time of Klein's demand, that Klein would litigate on Qlik's behalf until judgment. Circumstances intervened. A third-party investor bought Qlik, resulting both in Klein losing her interest in the litigation and Qlik changing its corporate mind about whether to litigate on its own behalf. We do not have even the slightest reason to believe that this transaction was designed with its impact on this litigation in mind. Neither Klein nor Qlik seems to have engaged in any trickery. Both seem merely to have responded to the extra-litigation circumstances as they presented themselves.

Further, we can discern no unfairness to the Cadian Group in allowing substitution. Of course, if substitution were not allowed, they would no longer have to defend this action or to worry about disgorging the profits from their alleged short-swing trades. And this suit has gone on long enough that if Qlik were to bring a new suit on these claims, the Cadian Group would have a statute of limitations defense. No doubt it is unfortunate for them that Rule 17(a)(3) is

25

the only thing keeping them in court. Unfortunate, but not unfair. Ensuring that an otherwise proper suit is not dismissed for want of a proper party when that party is ready and willing to join the fray is the very purpose of Rule 17(a)(3). *See Cortlandt*, 790 F.3d at 420-21. Rule 17's relation-back provision furthers that purpose in situations like this one, where the course of the litigation has traveled beyond the limitations period through no fault of the real party in interest or the party representing them.

We need not determine whether Qlik committed an "honest mistake" when it declined Klein's demand because, contrary to the dissent's suggestion and the district court's holding, a plaintiff's honest mistake is not a precondition for granting a Rule 17(a)(3) motion. Only in two opinions interpreting Rule 17 do we ever refer to a plaintiff's honesty, and in neither do we declare that establishing an "honest mistake" is necessary. In *Cortlandt*, we mentioned by way of background that Rule 17(a)(3) "codifies the modern 'judicial tendency to be lenient when an honest mistake has been made in selecting the proper plaintiff.'" 790 F.3d at 421 (quoting 6A Charles Alan Wright et al., Federal Practice & Procedure § 1555 (3d ed. 2014)). But when it came time to enumerate 17(a)(3)'s requirements, we relied, as we do today, on *Advanced Magnetics*, calling it the

26

"leading case interpreting the Rule." *See Cortlandt*, 790 F.3d at 422. In *DeKalb County Pension Fund v. Transocean Ltd.*, we mentioned that substitution of the real party in interest should be denied when that party has neither established that "its tardy appearance was understandable or honest, nor pointed to a semblance of any reasonable basis therefor." 817 F.3d 393, 412 (2d Cir. 2016) (internal quotation marks omitted). This statement was dicta,[7] and, in any case, requiring "a semblance of a reasonable basis" for a real party in interest's "tardy appearance" is not the same as requiring that party to establish that she made an "honest mistake."[8] Thus, both *Cortlandt* and *DeKalb* are entirely consistent with *Advanced Magnetics*, which focused on "bad faith." 106 F.3d at 20-21. Establishing that a real party in interest has made an honest mistake is, at most, one way of

---

[7] Contrary to the dissent's suggestion, *DeKalb*'s conclusion that the original plaintiff lacked standing and the court thus lacked subject matter jurisdiction ab initio could not be an "alternative holding." *See* Dissent at 7. "[I]n the absence of a plaintiff with standing . . . there [is] . . . no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise." *Cortlandt*, 790 F.3d at 423. Whether the real party in interest made a mistake does not even enter into consideration.

[8] The dissent suggests that these two concepts are the same. Dissent at 8. If so, then it seems the main focus of disagreement is the narrow question of whether Qlik had any semblance of a reasonable basis for failing to join the suit earlier. We think Qlik exhibited at least "minimal diligence" in the circumstances of this case (for the reasons articulated above); our dissenting colleague does not.

making clear that her failure to join the suit at a previous stage of the litigation[9] was not "deliberate or tactical." *Id.* Whether or not it was an "honest mistake" for Qlik not to join this suit at its outset (or at any point prior to the Rule 17 motion), it did not act in bad faith.

Finally, we conclude that substituting Qlik here is "necessary to avoid injustice," *id.* at 20 (internal quotation marks omitted), because a rule disallowing substitution in these circumstances would contravene the purpose of shareholder derivative suits. A company that rejects a demand to sue does so with the knowledge that a shareholder can sue on its behalf. Unlike in the class action context, the filing of a derivative action does not toll the statute of limitations on the substantive cause of action so that a company can intervene if a shareholder loses her interest in the suit (legal or otherwise). *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051-54 (2017) (discussing the equitable tolling rule in the class context and distinguishing it from securities actions governed by the Securities Exchange Act's statutes of repose); *SRM Global Master Fund Ltd. P'ship*

---

[9] In asking why a real party in interest did not join the suit earlier, a court need not only focus on the time at which the suit was brought (or at which demand was rejected). Bad faith in failing to join at *any* prior point in the litigation can call into question the propriety of allowing substitution.

*v. Bear Stearns Co. L.L.C.*, 829 F.3d 173, 176-77 (2d Cir. 2016) (same). Thus, if a company were disallowed from joining a suit under Rule 17(a)(3) merely because it had rejected a shareholder's demand, its ability (and the ability of its other shareholders) to recover assets of which it was illegally deprived would stand or fall with the continuing financial interest of the representative shareholder. Other shareholders would have to maintain separate derivative actions to avoid having their investment depend on the vicissitudes of that litigation, resulting in a "needless multiplicity of actions." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351 (1983). Companies would reasonably doubt whether relying on a derivative shareholder to protect their interests would be prudent, undermining Rule 23.1 and the policies it furthers.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's dismissal of this action and REMAND for substitution of Qlik and further proceedings consistent with this decision.

LOHIER, *Circuit Judge*, dissenting:

I would affirm Judge Ramos's decision. Klein's action under Section 16(b) of the Securities Exchange Act became moot and the District Court lost jurisdiction the moment she ceased to have any financial stake in Qlik. In the alternative, Judge Ramos was right to dismiss the action under Rule 17(a)(3) when Klein failed to show that the untimeliness of her motion to substitute Qlik as the plaintiff resulted from an "honest mistake." I address each of these independent reasons for affirmance in turn.

1. Mootness

The majority's take on justiciability and mootness is laudable as a matter of policy but wrong as a matter of law. In United States v. Sanchez-Gomez, a decision that issued while this appeal was pending, the Supreme Court reminded us that a "case that becomes moot at any point during the proceedings is no longer a Case or Controversy for purposes of Article III, and is outside the jurisdiction of the federal courts." 138 S. Ct. 1532, 1537 (2018) (quotation marks omitted). To avoid dismissal on mootness grounds, the Court explained, "a plaintiff must show a personal stake in the outcome of the action," thereby ensuring that an "actual and concrete dispute[]" exists "at all stages of review,

not merely at the time the complaint is filed." Id. (quotation marks omitted). The Court recognized that some of its prior decisions involving class actions applied a less rigid mootness rule. See id. at 1537–40. But the Court confined those decisions exclusively to class actions, explaining that reliance on a more relaxed rule of mootness in other contexts would be "misplaced." Id. at 1537. The Court's reaffirmation of Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66 (2013), confirms this reading of Sanchez-Gomez. In Genesis Healthcare, the Court declined to extend its more flexible mootness doctrine for class actions to "collective actions" brought under the Fair Labor Standards Act (FLSA), even though a collective action is "a procedural device bearing many features similar to a class action." Sanchez-Gomez, 138 S. Ct. at 1539–40 (citing Genesis Healthcare, 569 U.S. at 73–75).

With Sanchez-Gomez in mind, let me turn to this appeal. Klein, the only plaintiff in the case, indisputably had a personal stake in the action before Qlik's cash-out merger transaction closed and her shares were purchased. Had Klein received stock in a parent company rather than cash after the merger, she would have preserved her personal stake in this litigation. See Gollust v. Mendell, 501 U.S. 115, 126–28 (1991). But the "intervening circumstance" of Qlik's cash-out

2

merger in this case stripped Klein of any financial position in the company and therefore any stake in the outcome of this suit. See Genesis Healthcare, 569 U.S. at 72. At that point, "the action [could] no longer proceed," and the District Court, divested of a concrete dispute, was obligated to dismiss it as moot. See id.

Viewing Sanchez-Gomez as a barrier, the majority stretches to label Klein a "representative plaintiff," analogizes her suit under Section 16(b) of the Securities Exchange Act to either class action litigation or shareholder derivative suits, and insists that, under the looser mootness doctrine applicable to class actions, the District Court "maintain[ed] its jurisdiction at least long enough to determine whether a substitution could avoid mootness." Majority Op. at 15–24. But if Sanchez-Gomez forecloses an analogy between class actions and FLSA collective actions, then the analogy that the majority attempts to draw between a class action and a Section 16(b) action (where a single shareholder pursues a claim on behalf of a single issuer rather than a collective) is surely even further afield. Nor is the majority's analogy to derivative suits under Rule 23.1 of the Federal Rules of Civil Procedure an apt one. To the contrary, we have explicitly held that "[t]he standing requirements for shareholder derivative suits are not applicable to a § 16(b) plaintiff." Mendell ex rel. Viacom, Inc. v. Gollust, 909 F.2d 724, 728

3

(2d Cir. 1990) (emphasis added), aff'd on other grounds sub nom. Gollust v. Mendell, 501 U.S. 115 (1991); see also 9 LOUIS LOSS, JOEL SELIGMAN & TROY PAREDES, SECURITIES REGULATION 384 (5th ed. 2018) ("Rule 23.1 … has been held inapplicable to actions under § 16(b) in view of the policy and language of that Section.").

I would therefore affirm the District Court's dismissal of this case for lack of jurisdiction.

2. Rule 17(a)(3)

Even if the District Court retained jurisdiction after the merger, it correctly held, in the alternative, that Klein's motion to substitute Qlik under Rule 17(a)(3) "would fail." Klein v. Cadian Capital Mgmt., LP, 15 Civ. 8140 (ER), 2017 WL 4129639, at *10 n.13 (S.D.N.Y. Sept. 15, 2017).

According to the majority, the District Court was wrong to hold that Rule 17(a)(3) permits substitution only if there has been an "honest mistake" in selecting the proper plaintiff and that Qlik's decision to refuse Klein's demand was not an "honest mistake." Majority Op. at 25. But the majority simply ignores our precedent requiring a movant under Rule 17(a)(3) to show that the failure to timely select the proper plaintiff reflected an honest mistake. See

4

United States v. Zedner, 555 F.3d 68, 82 n.3 (2d Cir. 2008) (Pooler, J., dissenting) ("[W]e are bound by the decisions of prior panels until such time as they are overruled by an en banc panel of our Court or by the Supreme Court." (quotation marks omitted)).

In Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.À.R.L., for example, we explained that Rule 17(a)(3) "codifies the modern judicial tendency to be lenient when an honest mistake has been made in selecting the proper plaintiff." 790 F.3d 411, 421 (2d Cir. 2015) (emphasis added) (quotation marks omitted). "We have ordinarily allowed amendments under Rule 17," we stated, "only when a mistake has been made as to the person entitled to bring suit." Id. at 424 (emphasis added) (quotation marks omitted). The majority casts our language in Cortlandt as mere "background." Majority Op. at 28. Maybe. However you wish to describe it, that language became binding precedent less than a year later, in DeKalb County Pension Fund v. Transocean Ltd., 817 F.3d 393 (2d Cir. 2016). There we confirmed that Rule 17(a)(3) "'was added . . . to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought' and 'codified the modern judicial tendency to be

5

lenient when an <u>honest mistake</u> has been made in selecting the proper plaintiff.'"

<u>Id.</u> at 412 (emphasis in original) (quoting <u>Cortlandt</u>, 790 F.3d at 421).  We then applied the "honest mistake" requirement, holding that DeKalb, which had belatedly moved to be appointed lead plaintiff in a class action, had no recourse under Rule 17(a)(3) because it had not "suggested that whatever 'mistake' may have led to its tardy appearance was 'understandable' or 'honest,' nor pointed to a 'semblance of any reasonable basis' therefor."  <u>Id.</u> (quoting <u>Advanced Magnetics, Inc. v. Bayfront Partners, Inc.</u>, 106 F.3d 11, 20 (2d Cir. 1997)).  We noted that no injustice arose from applying the requirement because DeKalb could have "through minimal diligence" made a "timely motion to intervene in the action as a named plaintiff."  <u>Id.</u> (quotation marks omitted).

The "honest mistake" requirement did not come out of thin air.  The Rules Advisory Committee has long described Rule 17(a)(3) as a mechanism to account for "when an <u>honest mistake</u> has been made in choosing the party in whose name the action is to be filed."  Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment (emphasis added).  The Advisory Committee's Notes on Rule 17(a)(3), which are "a reliable source of insight into the meaning of [the] rule," <u>United States v. Vonn</u>, 535 U.S. 55, 64 n.6 (2002), directly contradict the majority's

6

view that a "plaintiff's honest mistake is not a precondition for granting a Rule 17(a)(3) motion," Majority Op. at 27. The Notes also comport with our previously expressed view that a "district court retains some discretion to dismiss an action where there was no semblance of any reasonable basis for the naming of an incorrect party." Advanced Magnetics, 106 F.3d at 20.

The majority avoids its duty to follow DeKalb (to say nothing of the Advisory Committee's Notes) in two ways.

First, it characterizes DeKalb's central holding as "dicta." Majority Op. at 28. But DeKalb's "honest mistake" requirement is not dictum: We squarely held that DeKalb's Rule 17(a)(3) argument failed in the absence of an "honest," "understandable," or "reasonable" basis for not seeking to become the lead plaintiff in the action sooner. 817 F.3d at 412 (quotation marks omitted). We also held, in the alternative, that even if DeKalb had made an honest mistake, its motion could not relate back to another party's timely complaint under the circumstances of that case. Id. at 412–13. This alternative holding did not downgrade our "honest mistake" holding to dictum. To the contrary, our determination that DeKalb's motion failed to satisfy the "honest mistake" requirement is "an entirely appropriate basis for a holding in th[is] later case."

7

Pyett v. Pa. Bldg. Co., 498 F.3d 88, 93 (2d Cir. 2007), rev'd on other grounds sub nom. 14 Penn Plaza LLC v. Pyett, 556 U.S. 247 (2009).

Second, the majority reasons that "requiring 'a semblance of a reasonable basis' for a real party in interest's 'tardy appearance' is not the same as requiring that party to establish that she made an 'honest mistake.'" Majority Op. at 28–29. In my view, there is no logical distinction between the two phrases: A party that has no "semblance of any reasonable basis" for naming the wrong plaintiff necessarily has not made an "honest mistake" in naming the wrong plaintiff, and vice versa.

With DeKalb's holding in mind, on this record Judge Ramos got it right when he concluded that Klein and Qlik failed to demonstrate that they made an "understandable" or "honest" mistake in not earlier seeking to make Qlik the plaintiff (or, put another way, that there was a "semblance of any reasonable basis" for their delay). Recall that Qlik rejected Klein's initial demand to sue the defendants based on their alleged short-swing trading. Then Klein and Qlik waited until months after Qlik's merger was publicly announced and ultimately closed to move to substitute Qlik as the plaintiff. Had they exercised even

8

"minimal diligence," they could have filed "a timely motion."  See DeKalb, 817 F.3d at 412 (quotation marks omitted).

The majority worries that a "needless multiplicity of [Section 16(b)] actions" would flow from affirming Judge Ramos's decision to reject the Rule 17(a)(3) motion in this case.  Majority Op. at 30 (quotation marks omitted).  With respect, that is a policy justification, not a legal one rooted in the Rule.  And even if there were evidence to support the majority's worry (there is not), "district courts have ample tools at their disposal to manage the suits, including the ability to stay, consolidate, or transfer proceedings."  China Agritech, Inc. v. Resh, 138 S. Ct. 1800, 1811 (2018).

For these reasons I dissent.