Stagg, P.C. v. U.S. Dept. of State

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: March 4, 2020          Decided: December 28, 2020)

Docket No. 19-811

_____

STAGG, P.C.,

*Plaintiff-Appellant*,

v.

U.S. DEPARTMENT OF STATE; DIRECTORATE OF DEFENSE TRADE CONTROLS; MICHAEL POMPEO, in his official capacity only as Secretary of State,

*Defendant-Appellees.**

_____

Before:

LEVAL, HALL, and LYNCH, *Circuit Judges.*

Plaintiff Stagg, P.C. appeals from the judgment of the United States District Court for the Southern District of New York (Katherine Polk Failla, *J.*) granting summary judgment to Defendants, the Department and Secretary of State (and one of its subdivisions), on Plaintiff's challenge to the constitutionality of a speech licensing requirement imposed by the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120.1–130.17. The district court concluded, *inter alia*, that the ITAR's licensing requirement unambiguously did not apply to the categories of speech that Plaintiff's complaint asserted an intention to undertake, with the consequence that the

---

* The Clerk of Court is directed to amend the caption as set forth above.

question whether the provision would be unconstitutional in some applications is moot, because none of those provisions applies to what Stagg alleges it intends to do. We agree that Plaintiff's intended conduct is not subject to the ITAR's licensing requirement and further conclude that that finding renders Stagg's constitutional challenges moot. We therefore VACATE the judgment of the district court and direct that the action be DISMISSED.

LAWRENCE D. ROSENBERG (Christopher B. Stagg, Stagg, P.C., New York, NY, *on the brief*), Jones Day, Washington, DC, *for Plaintiff-Appellant.*

DOMINIKA TARCZYNSKA, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellees.*

LEVAL, *Circuit Judge*:

Plaintiff Stagg, P.C. ("Stagg") appeals from the judgment of the United States District Court for the Southern District of New York (Katherine Polk Failla, *J.*) granting summary judgment to Defendants, the United States Department of State ("DOS"), the Secretary of State, and the Directorate of Defense Trade Controls, ("DDTC").[1] The complaint seeks, *inter alia*,

---

[1] A glossary of acronyms employed in this opinion is as follows: Arms Export Control Act ("AECA"), Directorate of Defense Trade Controls ("DDTC"),

declaratory judgment that DOS's International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120.1–130.17, impose an unconstitutional prior restraint on Plaintiff's intended speech and are unconstitutionally vague.

Under the ITAR and their governing statute, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, a party seeking to export items designated as "defense articles and defense services" must first register with the DDTC, a subdivision of DOS, and obtain a license for each export. The ITAR's licensing requirement covers, *inter alia*, "technical data" that is required for the design, manufacture, maintenance, or modification of a defense article, unless the data is "in the public domain," as defined in the ITAR. 22 C.F.R. §§ 120.10, 120.11. Transferring such data to a foreign person within the United States is considered an "export" under the ITAR, thus triggering the registration and licensing requirements. Violation of the ITAR may result in severe criminal or civil penalties.

Stagg is a law firm, which specializes in export control matters. The complaint asserts that Stagg intends to speak on the ITAR's technical data

---

Department of State ("DOS"), International Traffic in Arms Regulations ("ITAR"), United States Munitions List ("USML").

provisions at public conferences, and to publish free educational materials on that topic on its website. To provide useful examples in its materials, it intends to republish information pertaining to defense articles that is excluded from the ITAR's licensing requirement by the exception for materials "in the public domain." 22 C.F.R. § 120.11. Some of these examples will involve Stagg's "aggregation" or "modification" of public domain information.

The complaint alleges that Stagg has been deterred from engaging in its intended speech by two public statements of DOS: one which expresses the view that technical data does not qualify for the public domain exclusion if it "has been made available to the public without authorization," 80 Fed. Reg. 31,525, 31,535 (June 3, 2015), and another, which states, "[I]t is seldom the case that a party can aggregate public domain data for purposes of application to a defense article without . . . creating a data set that itself is not in the public domain," 78 Fed. Reg. 31,444, 31,445 (May 24, 2013). Stagg asserts that the publicly available information it intends to use has never been authorized by the Government for release into the public domain, and also that it fears its aggregation and modification of public domain data will create a data set that

4

Defendants will consider to be ITAR-controlled. It asserts a concern, in light of DOS's statements, that its intended speech will subject it to prosecution for unlicensed export of ITAR-controlled technical data to foreign persons who may attend its presentations or access the materials on its website. It seeks a declaratory judgment that the ITAR's licensing requirement violates the First and Fifth Amendments, primarily because it gives vague, excessive, and standardless discretion to the licensing authority.

The district court granted summary judgment to Defendants, concluding, *inter alia*, that the text of the ITAR unambiguously does not require a license for Stagg's intended republication of information in the "public domain" that has not been previously authorized for release into the public domain. In a later ruling on Stagg's motion for reconsideration, the district court characterized its previous ruling as finding "that the purported prior restraint alleged in [Stagg's complaint] did not exist" because the ITAR did not apply to Stagg's intended speech, and rejected on standing grounds Stagg's request for a declaratory judgment that the licensing scheme is unconstitutional. App'x at 83. While it was clear that the district court ruled against Stagg and dismissed its complaint, it was not entirely clear whether

and to what extent the district court regarded this ruling as a judgment on the merits or as a dismissal for lack of Article III jurisdiction.

This appeal followed. For the reasons below, we agree substantially with the district court's reasoning that the licensing regulations did not cover Stagg's pleaded intended speech and conclude that the complaint should be dismissed under Article III because Stagg is no longer at risk of injury from the licensing provisions it claims are unconstitutional.

## I.    BACKGROUND

**A. The Statutory and Regulatory Scheme**

Section 38 of the AECA authorizes the President to control the export of "defense articles and defense services." 22 U.S.C. § 2778(a)(1). It further authorizes the President to "designate those items which shall be considered as defense articles and defense services," and to "promulgate regulations for the . . . export of such articles and services." *Id.* The President has delegated this authority to the Secretary of State, Exec. Order 13,637, who has promulgated the ITAR to implement Section 38 of the AECA. *See* 22 C.F.R. §§ 120.1–130.17. The ITAR are primarily administered by the DDTC. *See id.* § 120.1(a). The list of items designated as "defense articles and defense

6

services" is identified as the United States Munitions List ("USML"). It appears within the ITAR. 22 C.F.R. § 121.1. Currently, the USML lists 21 categories of items that are designated as "defense articles or defense services," such as "Firearms and Related Articles" and "Spacecraft and Related Articles." *Id.*

Under the AECA, any person "who engages in the business of manufacturing, exporting, or importing any" of the items on the USML must register with the DDTC and pay a registration fee prescribed by regulation. 22 U.S.C. § 2778(b)(1)(a)(i). The ITAR specify that "engaging in such a business requires only one occasion of manufacturing or exporting or temporarily importing a defense article or furnishing a defense service." 22 C.F.R. § 122.1(a).

The AECA further provides that no defense articles or defense services included in the USML "may be exported or imported without a license for such export or import," except as otherwise provided by the ITAR. 22 U.S.C. § 2778(b)(2). The ITAR provide that, with some limited exemptions not relevant here, a registrant who wishes to export unclassified "technical data" must acquire what is known as a DSP-5 license beforehand. 22 C.F.R. § 125.2.

As relevant here, the term "technical data" is defined to include "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1). Each of the 21 categories designated as "defense articles or defense services" in the USML is defined to include "technical data" either "relating" or "directly related" to the listed articles. *See id.* § 121.1.

The ITAR define "export" to include "releasing or otherwise transferring technical data to a foreign person in the United States," which is classified as a "deemed export." 22 C.F.R. § 120.17(a)(2). Additionally, the ITAR define "defense service" to include the "furnishing to foreign persons of any technical data controlled under this subchapter . . . whether in the United States or abroad." 22 C.F.R. § 120.9(a)(2). Thus, the ITAR require registration and a license before one may "releas[e] or otherwise transfer[]" technical data to any foreign person in the United States.[2]

---

[2] "Foreign person" is defined, with some exceptions not relevant here, as any natural person who is not a U.S. citizen, lawful permanent resident, or holder of one of an enumerated group of other immigration statuses. 22 C.F.R. § 120.16.

Crucially for this case, "technical data" does *not* include "information in the public domain." 22 C.F.R. § 120.10(b). "Public domain" means information which is published and which is generally accessible or available to the public:

> (1) Through sales at newsstands and bookstores;
>
> (2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;
>
> (3) Through second class mailing privileges granted by the U.S. Government;
>
> (4) At libraries open to the public or from which the public can obtain documents;
>
> (5) Through patents available at any patent office;
>
> (6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;
>
> (7) Through public release (*i.e.*, unlimited distribution) in any form (*e.g.*, not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also § 125.4(b)(13) of this subchapter);
>
> (8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

22 C.F.R. § 120.11(a). "Information which is in the public domain [as defined in § 120.11] is not subject to the controls of" the ITAR. *Id.* § 125.1(a).

A willful violation of Section 38 of the AECA or of the ITAR is punishable by a fine of up to $1,000,000 or imprisonment of up to 20 years, or both. 22 U.S.C. § 2778(c). Additionally, a civil penalty of up to $1,183,736 may be imposed for a violation of Section 38 of the AECA. 22 C.F.R. § 127.10(a)(1)(i).[3]

The ITAR establish several circumstances in which a license can be denied or revoked, including whenever "the Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). The ITAR further provide that the administration of the AECA, including

---

[3] The text of the ITAR's civil penalty provision says nothing with respect to whether the exporter must have acted with any particular mental state, 22 C.F.R. § 127.10, and we express no view on that question.

10

licensing decisions and revocations, is not subject to judicial review under the Administrative Procedure Act. 22 C.F.R. § 128.1.

Focusing largely on the unlimited discretion afforded by the standard "or is otherwise advisable," as well as the lack of procedural safeguards (such as judicial review) to reduce the danger of abuse of that discretion, Stagg seeks a declaratory judgment that the ITAR license scheme operates as an unconstitutional prior restraint on speech.[4]

**B. Defendants' Public Statements Interpreting the ITAR**

Stagg asserts that its fears of prosecution result largely from two public statements of DOS interpreting the ITAR. First, on May 24, 2013, DOS posted a notice in the Federal Register (the "2013 Notice") responding to requests for clarification whether the aggregation of public domain data could be considered a "defense service" or render the data "other than public domain." The 2013 Notice stated:

> The Department confirms that a defense service involves technical data and therefore the use of publicly available information would not constitute a defense service. . . . The Department notes, however, that it

---

[4] Stagg further argues that the ITAR licensing requirement fails strict scrutiny and is unconstitutionally overbroad because it regulates domestic publication of certain scientific and technical information merely because foreign persons *might* obtain the published information, regardless of the speaker's intent, and that the scope of the ITAR's licensing requirement is impermissibly vague.

11

is seldom the case that a party can aggregate public domain data for purposes of application to a defense article without using proprietary information or creating a data set that itself is not in the public domain.

78 Fed. Reg. at 31,445.

Second, on June 3, 2015, DOS issued a notice of proposed rulemaking (the "2015 Notice") that would have amended the definition of "public domain" to state that "technical data . . . is not in the public domain if it has been made available to the public without authorization." 80 Fed. Reg. at 31,535. The 2015 Notice contained the following explanatory preamble:

Paragraph (b) of the revised definition explicitly sets forth the Department's requirement of authorization to release information into the 'public domain.' Prior to making available 'technical data' or software subject to the ITAR, the U.S. government must approve the release . . . .

The requirements of paragraph (b) are not new. Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department . . . to release ITAR controlled 'technical data,' as defined in § 120.10. . . . This proposed provision will enhance compliance with the ITAR by clarifying that 'technical data' may not be made available to the public without authorization. Persons who intend to discuss 'technical data' at a conference or trade show, or to publish it, must ensure that they obtain the appropriate authorization.

80 Fed. Reg. at 31,528. This proposed amendment was never adopted.

12

**C. Procedural History**

**1. Stagg's Complaint**

Stagg's operative complaint alleges that it "seeks to immediately speak publicly and to immediately publish free educational materials on the ITAR's technical data provisions, including at upcoming public conferences," and that it "intends to speak and publish such materials on a continual basis." App'x at 114–15. The purpose of these materials is to "provide educational awareness to the public on how to comply with the ITAR's technical data controls." *Id.* at 115. "This speech would also contain some comments critical of the government and . . . propose future regulatory revisions in this area." *Id.* The complaint also alleges Stagg's intention to publish these presentation materials to its website. *Id.* at 116.

As examples in these materials, Stagg seeks to use "published and generally accessible public information that is available from bookstores and libraries . . . [that] would have otherwise constituted technical data but is excluded from the technical data provisions because it is in the public domain." *Id.* at 115. Stagg alleges that the information it intends to use was "not authorized by the Defendants into the public domain." *Id.* at 116.

13

Additionally, Stagg intends to "aggregate and modify public domain information to provide more interactive examples" in its conference presentations and published materials. *Id.* The complaint does not contain any allegations that Stagg possesses, or intends to disseminate or include in its materials, any technical data that is not "published," "generally accessible," and "available from bookstores and libraries." Stagg alleges that it is "stopped from speaking and publishing" because the 2013 Notice and 2015 Notice render its intended uses of publicly available information subject to the ITAR's registration and licensing requirements. *Id.* at 115–16. As relevant here, it seeks declarations "that Defendants' prior restraint is facially invalid under the First Amendment" and "that Defendant's prior restraint is invalid under the Fifth Amendment" as an impermissibly vague law. *Id.* at 118.

### 2. Stagg's Motion for Preliminary Injunction

Stagg filed a motion for preliminary injunction,[5] seeking to enjoin "any licensing or other approval requirements for putting privately generated

---

[5] The complaint seeks an injunction, as well as declaratory judgment. Plaintiff, however, subsequently abandoned the claim for an injunction.

14

unclassified information into the public domain." *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210 (S.D.N.Y. 2016).

Against the background described above of government statements asserting that materials appearing to fall within the public domain exclusion might not be excluded from ITAR's license requirement, either because they came into the public domain without authorization or because the materials in the public domain had been aggregated, the district court held that Stagg had standing to challenge the ITAR based on its allegations that it possessed technical data "available in — but unauthorized for release into — the public domain, that it wants to aggregate into a set of materials for presentation to an audience." *Id.* at 209.

The district court[6] then concluded that the balance of the equities and the public interest required denial of Stagg's motion for a preliminary injunction. *Id.* at 210. Noting that Stagg's requested injunction would extend not just to situations involving the republication of publicly available technical data but to "all situations where individuals wished to disclose technical data generate[d] privately but covered by the ITAR," the court

---

[6] The case at that time was assigned to Judge Shira A. Scheindlin and was later transferred to Judge Failla.

15

concluded that the injunction would have "very serious adverse impacts on the national security of the United States." *Id.*

The court also rejected the possibility of entering an injunction limited to republication of previously published technical data. Because Stagg declined to provide any detail as to the nature of the information it intended to use in its presentations, the district court had "no choice but to assume the worst case scenario — e.g. technical data regarding highly sensitive defense systems published by an unauthorized source, repackaged by Stagg P.C. for purposes of its speeches." *Id.* at 210 n.47.

This court affirmed by summary order. Regarding the question whether Stagg had standing, we reasoned that "[i]n stating that (1) it presently seeks to disseminate information already in its possession subject to ITAR's challenged licensing requirement and (2) it has already refrained from doing so for fear of being sanctioned, Stagg has alleged the real or immediate threat of future injury necessary for standing." *Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 94–95 (2d Cir. 2016) (summary order) (internal quotation marks omitted). We further noted:

> [M]any of Stagg's arguments on appeal could be read as attacking not the existing regulatory scheme, but either a proposed regulation that

was never adopted [*i.e.*, the June 3, 2015 proposed rule], or a prior regulation that Stagg claims was once in force but has since been repealed. Constitutional questions about regulations that no longer exist or that have been under consideration do not present cases or controversies within a court's Article III jurisdiction. Here, however, the government unambiguously confirmed at oral argument that Stagg correctly characterizes the government's interpretation of the existing regulatory scheme . . . . Thus, we agree that Stagg has standing to challenge that scheme as the government construes it.

*Id.* at 95 n.1 (internal citation omitted). As to the merits, we found no

abuse of discretion in the district court's decision to deny preliminary

injunctive relief. *Id.* at 96.

### 3. The Parties' Cross-Motions for Summary Judgment

The parties cross-moved for summary judgment. In support of Stagg's

motion for summary judgment, Christopher Stagg, Stagg's principal and lead

attorney, submitted two declarations in which he reiterated that Stagg wished

to use "examples of published and generally accessible information that

would otherwise constitute technical data but for the public domain

exclusion" in its presentations and published materials, App'x at 136–37, and

that it wished to "aggregate and modify that information with application to

defense articles to show different and new ways that technical data relating to

defense articles can take form," *id.* at 138. The declarations also added that

17

some of the technical data Stagg wished to use would be taken from the Internet. *Id.* at 139, 152.

The district court denied Stagg's motion for summary judgment and granted Defendants' motion for summary judgment, concluding that "after evaluating the unambiguous text of the ITAR . . . it [could not] discern the constitutional infirmities identified by [Stagg]." App'x at 21. The court reaffirmed that Stagg had standing because, "under the Government's own stated interpretation of the regulatory scheme, Plaintiff may be subject to prosecution for republishing technical data that was obtained from otherwise public domain sources, but that was not authorized by Defendants to be placed into the public domain." *Id.* at 36.[7] On the other hand, analyzing the text of the ITAR, the court found that "[n]othing in the current [ITAR] can reasonably be interpreted to suggest that data that would otherwise qualify as public domain does not [so qualify] solely because it became publicly available without government authorization." *Id.* at 42–43. Similarly, it concluded that the text could not reasonably be interpreted to mean that

---

[7] The court also rejected a mootness challenge to Stagg's claim based on a statement, which had been posted to the DDTC's website during this litigation, purporting to clarify the meaning of DOS's 2015 Notice.

18

"non-aggregation and/or non-modification [were] prerequisites for public domain status." *Id.* at 44. On the basis of its construction of the ITAR, the court rejected each of Stagg's First Amendment challenges, noting in particular that "Plaintiff has failed to identify any aspect of the [ITAR] that operates as a prior restraint [on Stagg], and its arguments that the public domain exclusion fails the procedural requirements for constitutional prior restraints are irrelevant." *Id.* at 55–56. It also rejected Stagg's Fifth Amendment challenge. *Id.* at 58–60.

Stagg moved for reconsideration of the district court's opinion, which the court denied. Of particular relevance here, the court rejected several of Stagg's arguments for reconsideration on standing grounds. First, Stagg argued that the district court's summary judgment ruling failed to properly apply the unbridled discretion doctrine of *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988), and the requirement of certain procedural safeguards for prior restraints on speech under *Freedman v. Maryland*, 380 U.S. 51 (1965). The district court rejected this argument, explaining that its earlier decision concluded that the "purported prior restraints that were the subject of [Stagg's complaint] do not exist." App'x at 81. Thus, the court concluded, the

requirements of *Lakewood* and *Freedman* did not apply to any portion of the ITAR that Stagg had standing to challenge. *Id.* at 80–81. Similarly, the court rejected Stagg's contention that, regardless of whether Stagg's intended speech was subject to the ITAR under the district court's construction, the court should have entertained a broader challenge to the ITAR, examining whether the licensing scheme satisfied constitutional requirements in situations where a license is, in fact, required. The court stated:

> Plaintiff has not established standing to mount a facial challenge to portions of the ITAR regulating speech that does trigger the licensing requirement, because the characteristics that Plaintiff has disclosed about the speech it seeks to engage in — disseminating, aggregating, and modifying information already in the public domain, including republication of that information to the Internet — do not [trigger the licensing requirement].

*Id.* at 83.

## II.    DISCUSSION

**A. Article III's Requirement of a "Case" or "Controversy"**

We must first determine whether Stagg asserts a "case" or "controversy" within the jurisdiction of the federal courts. If not, then federal courts lack the power to adjudicate his claim for declaratory relief. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (noting that the authority of

federal courts is limited to resolving "the legal rights of litigants in actual controversies" (internal quotation marks omitted)). We have an ongoing duty to "'satisfy [ourselves] not only of [our] own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction . . . ."). Because the unambiguous terms of the ITAR exempt from its registration and licensing requirements the materials that Stagg's complaint asserts an intention to republish, we conclude that Stagg alleges no injury it might suffer resulting from application of the ITAR to its intended actions. Although Stagg's suit may have presented a "case" or "controversy" at the outset of this litigation, because of the Defendants' statements that threatened imposition of the licensing requirement for Stagg's intended speech, the district court's (and our) rulings on the meaning of the ITAR eliminate the threat. Accordingly, Stagg no longer has a personal stake in its plea for a declaration that those provisions are unconstitutional.

Article III of the United States Constitution provides that the judicial power of the United States extends to certain "cases" and "controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement of Article III encompasses both the requirement that the plaintiff establish standing to sue and the related doctrine of mootness.

The requirement of standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing is that "the plaintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" — which is fairly traceable to the defendant's actions and redressable by a favorable decision. *Id.* at 560–61 (internal quotation marks and citations omitted). The injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Under the doctrine of mootness, the plaintiff's "personal stake" in the outcome of the litigation "must be extant at all stages of review, not merely at the time the complaint is filed." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). When the plaintiff no longer has a legally cognizable interest in the outcome of the action, the case becomes moot and is no longer a "case" or "controversy" for the purposes of Article III. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

"In determining whether a litigant has standing to challenge governmental action as a violation of the First Amendment, . . . the litigant [must] demonstrate a claim of specific present objective harm or a threat of specific future harm." *Meese v. Keene*, 481 U.S. 465, 472 (1987) (internal quotation marks omitted). A plaintiff who seeks to bring a pre-enforcement challenge to a law asserts an Article III injury when he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159. Where the plaintiff alleges that a statute "delegates overly broad licensing discretion to an administrative office," he may challenge the statute "whether or not his conduct could be

proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. Maryland*, 380 U.S. 51, 56 (1965).

## 1. Stagg's "Personal Stake" in the Litigation

Stagg's complaint alleges that it intends to disseminate, through its published materials and public presentations, "published and generally accessible public information that is available from bookstores and libraries . . . [that] would have otherwise constituted technical data but is excluded from the technical data provisions because it is in the public domain." App'x at 115. This includes information, Stagg alleges, that was "not authorized by the Defendants into the public domain." *Id.* at 116. Additionally, the complaint asserts Stagg's intention to "aggregate and modify public domain information to provide more interactive examples." *Id.* The complaint does not allege an intention to disseminate anything that is not "published," "generally accessible," and "available from bookstores and libraries." Stagg asserts a fear of prosecution for two reasons: (1) because DOS's 2015 Notice interprets the ITAR to require a license for republication of materials that are publicly available through one of the means enumerated in the public domain provision, if these materials were never authorized for

24

release to the public; and (2) because DOS's 2013 Notice expresses DOS's view that aggregation of public domain materials can create a new set of "technical data," so that republication would require a license.

Notwithstanding these allegations, the district court concluded that Stagg "never truly faced a prior restraint." App'x at 65. We agree, and we therefore conclude that Stagg can no longer establish the requisite "personal stake" to sustain federal court jurisdiction, because its intended republication of these materials does not subject it to a credible threat of enforcement of the license requirement. *See Susan B. Anthony List*, 573 U.S. at 159.

*First*, under the ITAR licensing requirement, "technical data" that is subject to licensing does not include "information in the public domain." 22 C.F.R. § 120.10. "Public domain," in turn, "means information which is published and which is generally accessible or available to the public" through any of the means listed in § 120.11, including through bookstores, *id.* § 120.11(a)(1), and at libraries, *id.* § 120.11(a)(4). Nowhere do the ITAR state or imply that prior government authorization is required for information to qualify as "in the public domain." To the contrary, § 120.11 states unambiguously that any information which is "published" and "generally

25

accessible or available" through one of the listed means is in the public domain, and therefore is not subject to the ITAR's licensing requirement. Because the ITAR provisions are unambiguous on this point, DOS's 2015 Notice, proclaiming an interpretation contrary to the unambiguous terms of the regulations, has no effect. While a government agency's views are entitled to great deference as to the meaning of ambiguous provisions of that agency's regulations, when the regulations lay down an unambiguous rule, the agency's expression of views interpreting its regulations in a manner inconsistent with their plain meaning receives no deference. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (courts do not give deference to agency interpretation of its own regulation when regulation is unambiguous). Because the ITAR provisions make this plain, we conclude Stagg is not subject to a licensing requirement under the ITAR for use of "information that is available from bookstores and libraries" but was never "authorized by the Defendants into the public domain," App'x at 115–16, regardless of DOS's 2015 Notice to the contrary. That information is in the "public domain," and therefore is not subject to the ITAR. 22 C.F.R. § 125.1(a).

26

*Second*, nothing in the ITAR states, implies, or supports the interpretation that the bare aggregation of public domain data, without more, removes that data from the coverage of the public domain provision. Rather, the unambiguous text of the ITAR excludes *all* "information in the public domain" from the definition of "technical data." Information that otherwise satisfies the definition of "public domain" does not lose that status simply because it is presented together with other information that also satisfies that definition. Such information would still be "published" and "generally accessible or available to the public" through one of the eight means listed in § 120.11. Accordingly, Stagg's intent to release aggregations of public domain data does not establish a credible threat of enforcement of the ITAR against it.[8]

---

[8] While it is true that Defendants have taken the position in this litigation that there are "limited circumstances in which aggregation can create new technical data," App'x at 44, we need not consider those special circumstances because Stagg has not alleged that it will aggregate public domain data in a manner that would give rise to new technical data. Consistent with the 2013 Notice, Defendants' position is that aggregation of public domain data "would not create ITAR-controlled technical data . . . [unless the] aggregation is for purposes of application to a defense article, [and the aggregator] possesses the expertise necessary to make such an application." *Id.* at 43 (internal quotation marks removed); *see also* 78 Fed. Reg. at 31,445 (2013 Notice) ("[I]t is seldom the case that a party can aggregate public domain data

27

*Third*, with respect to Stagg's pleaded intention to "modify" public domain information in its publications and presentations, our analysis is somewhat different. "Modify" could mean anything from, at one extreme, republishing together (aggregating) in one republication public domain materials that previously had been published separately, changing a typeface, or substituting ellipses for text that is superfluous to Stagg's illustrative purpose, to, at the other extreme, changing the technical content of the data as it pertains to the manufacture or implementation of a defense article.

As for the first category of innocuous changes that do not alter the significance of the data, the above discussion of Stagg's intent to aggregate demonstrates why such changes would not create new technical data. The

_____

*for purposes of application to a defense article* without using proprietary information or creating a data set that itself is not in the public domain." (emphasis added)). Here, Stagg does not allege it intends to apply its aggregated data to a defense article. Rather, its alleged purposes are purely educational and illustrative: it intends to aggregate public domain information "to provide more interactive examples" during its public presentations and in its published materials. App'x at 116. Thus, notwithstanding the Government's acknowledgment that aggregation *might* subject public domain data to licensing when done "for purposes of application to a defense article, [and the aggregator] possesses the expertise necessary to make such an application," Stagg's pleaded intentions do not fall within those parameters. Stagg therefore raises no credible threat of prosecution based on its "aggregation" of public domain data.

clear terms of the ITAR cannot reasonably be understood to mean that the exemption for republication of public domain materials applies only when the prior publication is exactly reproduced in its entirety, in the same font and size, without any sort of innocuous alteration of appearance. The ITAR make clear that republication of public domain materials is exempt, notwithstanding superficial "modifications" that do not alter the content of the data.

On the other hand, as for "modifications" at the other extreme, which change the content — as opposed to the form — of technical data pertaining to defense articles from what was set forth in the public domain version, data that had been so modified would no longer be public domain materials. They clearly would be subject to the licensing requirement of ITAR.

Stagg's complaint does not specify how it intends to "modify public domain information" to create its "interactive examples." App'x at 116. Nor do Christopher Stagg's declarations provide any additional clarity. In his June 2018 declaration, for instance, Christopher Stagg states that Stagg wishes to "modify [public domain information] with application to defense articles to show different and new ways that technical data relating to defense articles

29

can take form and be presented." *Id.* at 138. Similarly, his August 2018 declaration states that Stagg intends to "provide real-world examples of what technical data looks like in various forms (which requires aggregating and modifying it) and at different phases (which also requires aggregating and modifying it)." *Id.* at 155. On their face, these statements of Stagg's intention to "modify" public domain data appear to mean nothing more than "modification" as to the *form* in which the data is presented, which, as discussed above, would not place such a modification under the ITAR's licensing requirement. Notwithstanding that substantive modifications would fall under the licensing requirement, the allegations in Stagg's complaint and in Christopher Stagg's declarations are too vague and imprecise to effectively plead a credible threat of subjugation of Stagg's "modifications" to the ITAR's licensing scheme.

Stagg further contends that it remains subject to a prior restraint, notwithstanding the district court's construction of the ITAR, because it remains unclear which Internet sources qualify for the public domain exception. The issue of Stagg's publication of Internet materials was introduced into this litigation by the declarations of Christopher Stagg,

submitted in relation to the competing motions for summary judgment. These declarations assert that Stagg intends to republish examples of technical data taken from the Internet in its presentations and publications. The problem with Stagg's argument is that its complaint includes no mention of an intention to republish materials from the Internet. The complaint speaks only of republishing materials "available in bookstores and libraries," all of which fall within the ITAR's exemption from the licensing requirement. An intention to publish material from the Internet that is not otherwise part of the "public domain" is not properly part of this suit. Christopher Stagg's declaration of such intention did not have the effect of expanding the allegations of the complaint. Having failed to plead an intention to republish materials derived from the Internet, Stagg may not now rely on the risk of prosecution for so doing as establishing its personal stake necessary to show a live Article III "case" or "controversy."

We conclude that Stagg has failed to allege an intention to engage in any activity that is subject to the ITAR's licensing requirement. The ITAR leave Stagg free to do all of the things it pleaded an intention to do, without being subject to the requirements of registration and licensing. Although

31

Stagg may have asserted a cognizable Article III injury at the outset of the litigation, by reason of the credible threat of enforcement raised by DOS's public statements interpreting the ITAR as covering Stagg's intended speech, the district court's (and our) rulings eliminate that threat.[9] It follows that the action must be dismissed for want of Article III jurisdiction. As for Stagg's contentions that the ITAR licensing scheme violates constitutional norms — because, *inter alia*, it lacks standards constraining the discretion of the

---

[9] Our determination that none of Stagg's intended activities alleged in its complaint is subject to the ITAR's licensing and registration requirements has preclusive effect, even though our ultimate conclusion is that we lack Article III jurisdiction. *See Roth v. McAllister Bros., Inc.*, 316 F.2d 143, 145 (2d Cir. 1963) (holding that defendant tugboat operator was estopped from denying that it was plaintiff's employer when that fact "constituted the sole basis for the New Jersey Compensation Court's dismissal of [plaintiff's] suit . . . on the ground that it lacked jurisdiction," and rejecting defendant's argument that collateral estoppel should not apply because the New Jersey court "found itself without jurisdiction, [and] consequently lacked jurisdiction to make any determination whatsoever"). As we explained in *Roth*, a court "always possesses jurisdiction to determine its jurisdiction, and any fact upon which that decision is grounded may serve as the basis for an estoppel by judgment in any later action." *Id.*; *see also Goldsmith v. Mayor & City Council of Baltimore*, 987 F.2d 1064, 1069 (4th Cir. 1993) ("[A] jurisdictional dismissal that does not constitute judgment on the merits so as to completely bar further transactionally-related claims still operates to bar relitigation of issues actually decided by that former judgment."); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4436 (3d ed. 2020) ("Although a dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion, it does preclude relitigation of the issues determined in ruling on the jurisdiction question . . . .").

licensing authority, lacks procedural safeguards, and fails to provide fair notice of its requirements — even if true, they do not assert a case or controversy within the meaning of Article III because, under the unambiguous provisions of the ITAR, none of Stagg's intended activities alleged in its complaint is subject to a licensing requirement, or indeed any other restriction on its speech, imposed by the ITAR. Stagg is thus in no way injured by the ITAR's licensing requirement, and its claims are moot.

### 2. Stagg's Further Arguments for Article III Jurisdiction

Stagg further argues that, notwithstanding the district court's (and our) ultimate conclusion that the ITAR licensing requirement does not apply to the intended conduct it pleaded, it nonetheless may challenge the constitutionality of that licensing requirement. It advances three reasons: (1) standing must be determined, as established in *Klein v. Qlik Techs., Inc.*, "as of the outset of litigation," 906 F.3d 215, 221 (2d Cir. 2018); (2) the district court's ultimate finding of lack of standing impermissibly contravened this court's earlier conclusion that "Stagg has standing to challenge [the ITAR] as the government construes it," *Stagg*, 673 F. App'x at 95 n.1; and (3) a facial challenge persists regardless of "whether . . . constructions of the ITAR would

33

eliminate the prior restraint . . . as it applies to Stagg" under Supreme Court precedent, Appellant's Br. 22–23. None of these arguments is persuasive.

*First*, Stagg contends that the district court's ultimate finding of lack of standing to seek declaratory relief as to the constitutionality of the ITAR, after having first concluding that Stagg had standing, violated the principle established in *Qlik* that standing is determined "as of the outset of the litigation." Appellant's Br. 22 (quoting *Qlik*, 906 F.3d at 221). Whatever merit Stagg's argument may have with respect to refinements of terminology for describing different forms of absence of adversity necessary to establish a "case" or "controversy" subject to federal court jurisdiction under Article III, its argument does not negate the conclusion that its suit fails to meet the "case" or "controversy" requirement.

In *Qlik*, a shareholder brought a derivative suit in the name of a corporation alleging that the corporation's fiduciaries committed violations of the Securities Exchange Act, causing loss to the corporation. *Qlik*, 906 F.3d at 218. During the pendency of the litigation, the corporation's shares were "bought out in an all-cash merger, causing [the shareholder-plaintiff] to lose any financial interest in the litigation." *Id.* The district court then dismissed

the case, describing the reason as the plaintiff's lack of standing. *Id.* We vacated the decision, explaining that standing "evaluates a litigant's personal stake as of the outset of litigation," at which time the plaintiff had standing. We explained that the applicable jurisdictional doctrine when a party loses its stake during the course of the litigation is not standing but mootness. *Id.* at 220–21, 228. We vacated the district court's dismissal for lack of standing and remanded for substitution of the corporation as the real party in interest so as to avoid being obliged to dismiss the action by reason of the mootness of the shareholder's claim. *Id.* at 228.

Whatever the merits of Stagg's observations on the *Qlik* precedent, they do not show that Stagg's suit satisfies Article III's requirement of a "case" or "controversy." The *Qlik* case, while noting an error in attributing the dismissal of the shareholder's derivative suit to the plaintiff's lack of standing, did not rule that the shareholder's suit should survive. To the contrary, it merely explained that the infirmity of the shareholder's suit was attributable to mootness, rather than lack of standing. The suit could satisfy Article III only by converting it from a shareholder's derivative suit in the name of the corporation into a suit brought by the corporation itself, so that

35

the shareholder's eventual loss of a personal stake in the suit after ceasing to be a shareholder became irrelevant to the satisfaction of Article III. The answer to Stagg's argument is that, as in *Qlik*, the proper explanation for the defect in Article III jurisdiction is "mootness," rather than "lack of standing." When the district court rejected DOS's arguments that Stagg's intended actions were subject to licensing, and ruled that they were not, Stagg's claim became moot. Notwithstanding that Stagg previously had standing to challenge the constitutionality of the licensing scheme because of its credible fear of prosecution based on DOS's assertions that it was so subject, the issue was mooted by the district court's (and our) ruling that the ITAR did not apply to such speech. The Government is precluded from further efforts to enforce the licensing requirement against Stagg for those categories of speech.[10] Therefore, at the most, Stagg's argument predicated on *Qlik* shows not that it has a personal stake in the suit that satisfies Article III, but only that its lack of a personal stake is attributable to mootness that arose from the district court's interpretive ruling, rather than to lack of standing as of the start of the litigation.

---

[10] *See supra* note 9.

36

*Second*, Stagg argues that the district court's ultimate conclusion impermissibly contravened this court's earlier conclusion, in ruling on Stagg's motion for a preliminary injunction, that "Stagg has standing to challenge [the ITAR] as the government construes it." Appellant's Br. 22 (quoting *Stagg*, 673 F. App'x at 95 n.1). But Stagg misconstrues the import of this court's ruling affirming Stagg's standing.

In ruling on the motion for a preliminary injunction, the district court concluded that Stagg had standing because the Government's assertions that Stagg's intended actions were subject to licensing gave rise to a credible fear of prosecution. That was the basis on which we affirmed the district court's conclusion that Stagg had standing. *See Stagg*, 673 F. App'x at 94–95. Our subsequent conclusion that Stagg has no personal stake depends on an altogether different basis. The district court ruled (and we agree) that the Government could not lawfully enforce the license requirement against Stagg for its intended speech alleged in the complaint because the unambiguous terms of the licensing scheme do not cover such speech. We conclude that Stagg no longer faces a credible threat of prosecution by virtue of the preclusive effect of our ruling.

Although on a superficial assessment, the district court's ultimate ruling (and our ruling in this decision) may appear inconsistent with this court's earlier ruling, in fact they are not. As of the start of the litigation, Stagg was ruled to have standing based on a credible threat of prosecution. Subsequently, Stagg's personal stake was vitiated by the ruling that the licensing scheme did not apply to Stagg's conduct. There is no inconsistency between the earlier and the ultimate rulings.

*Third*, Stagg argues that, under the Supreme Court's and our court's prior restraint case law, a facial challenge to the "deemed export" provision as a whole persists regardless of how we construe the ITAR. Stagg's cited precedents do not support its argument.

Stagg relies heavily on the Supreme Court's statement in *Freedman v. State of Maryland* that "it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." 380 U.S. at 56.

Read in its proper context, the quotation from *Freedman* does not support the proposition that a plaintiff need not allege a specific injury traceable to a licensing scheme in order to mount a facial challenge. The crucial point for our purposes is that Freedman had been convicted under a Maryland statute for showing a film without first seeking or obtaining a license from the State Board of Censors. *Freedman*, 380 U.S. at 52. In his effort to overturn the conviction, he argued to the Supreme Court that the statute's license requirement constituted an invalid prior restraint in light of the inadequacy of procedural safeguards for confining the licensors' decisions within constitutional limits. *Id.* at 54–56. The Supreme Court rejected the Maryland court's conclusion that, because he had violated only the provision of the statute outlawing the showing without a license, he could not attack alleged shortcomings of other provisions of the statute, including the procedural deficiencies in the licensing scheme. It was in this context that the Court said that Freedman could bring a facial challenge against the statute "whether or not . . . he applied for a license." *Id.* at 56. The availability of a facial challenge obviated Freedman's need to show that the application of the licensing scheme to his case would have been unconstitutional or that his

39

request for a license would have been denied, not his need to show that his activity was subject to the licensing requirement, as this was unquestionably shown by his conviction.

*City of Lakewood v. Plain Dealer Publishing Co.*, on which Stagg also relies, similarly does not establish that Stagg has standing to raise a broad facial challenge to provisions that do not apply to it. There, the City of Lakewood, Ohio adopted an ordinance giving the mayor broad authority to grant or deny applications for permits to place news racks on public property, and to place terms and conditions on any such permit. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 753 (1988). The plaintiff newspaper elected not to seek a permit, instead raising a facial challenge to the ordinance. *Id.* at 754. The majority held that the newspaper could bring its facial challenge. The dissent disagreed, arguing that it should have been required to apply for a permit first. *See id.* at 775–76 (White, J., dissenting) (describing the "usual rule" that, in cases involving administrative discretion over granting permits, the Court need not assume that the discretion will be illegally exercised, and that the plaintiff should "apply and see what happens" (internal quotation marks

40

omitted)); *id.* at 786 (opining that the "usual rules" concerning discretionary licensing laws should apply).

Thus, the key issue in *City of Lakewood*, as in *Freedman*, was whether a plaintiff could challenge a licensing scheme without applying for, and being denied, a license. There was no question whether the plaintiff's intended activities would subject it to the licensing requirement it sought to challenge.[11] *See id.* at 755–56 ("[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, *one who is subject to the law* may challenge it facially without the necessity of first applying for, and being denied, a license." (emphasis added)). *City of Lakewood* therefore does not stand for the proposition that a facial challenge lies as to licensing requirements not applicable to the plaintiff's intended activities. To read *City of Lakewood* otherwise would mean allowing any number of plaintiffs to raise a facial challenge to a licensing

---

[11] Although the Supreme Court's opinion does not discuss the plaintiff newspaper's complaint in any detail, there is every reason to assume that the complaint included an allegation that the newspaper intended to place a news rack on public property in Lakewood. This intention was the entire impetus for its suit, and it had already sought and been denied permission to place a news rack on a sidewalk in Lakewood under an earlier ordinance. *See City of Lakewood*, 486 U.S. at 753.

scheme without alleging a specific harm arising therefrom, effectively

eliminating the baseline requirement of Article III that a plaintiff demonstrate

a "personal stake" in the outcome of the litigation that is "extant at all stages

of review." *Sanchez-Gomez*, 138 S. Ct. at 1537.

Finally, Stagg cites *Lusk v. Village of Cold Spring*, 475 F.3d 480 (2d Cir.

2007), for the proposition that a prior restraint challenge does not consider

"the application of the statute to a particular set of facts." *Id.* at 493 n.15. *Lusk*

does not support Stagg's argument that we must adjudicate its facial

challenge to aspects the ITAR's licensing scheme even if we hold that that

scheme unambiguously does not apply to its intended speech. In *Lusk*, the

plaintiff challenged a local law, which prohibited making alterations to

certain buildings without prior permission from a review board. 475 F.3d at

482. The plaintiff challenged the law after having received a "Violation

Notice" from the defendant, charging him with violation of the law. *Id.* at 481.

The court did not hold that Lusk was not subject to the law. Thus, *Lusk* says

nothing about whether a plaintiff who is not injured (or no longer injured) by a licensing scheme may maintain a facial challenge to that scheme.[12]

* * *

In sum, we conclude that Stagg's constitutional challenges to the ITAR do not assert a case or controversy within the jurisdiction of the federal courts because the unambiguous provisions of the ITAR do not subject Stagg (to the extent of its intended activities as alleged in its complaint) to any licensing requirement or credible threat of enforcement.

We agree with the district court that the ITAR licensing scheme does not apply to Stagg's intended conduct alleged in the complaint, and so rule. We disagree with the district court, however, as to the consequences of that ruling. As a result of the district court's (and our) rulings on the unambiguous inapplicability of the ITAR license requirement to Stagg's intended actions, Stagg has no personal stake in its suit for a declaration that the ITAR licensing scheme is unconstitutional. Stagg's suit therefore fails the test of Article III jurisdiction, and the appropriate disposition is dismissal of the suit, rather

---

[12] Stagg also relies on several out-of-circuit cases to support its proposition that it may bring a facial challenge to the "deemed export" provision regardless of our construction of the ITAR. To the extent that these cases are inconsistent with the analysis here, we find them unpersuasive.

than the grant of summary judgment to the Defendants. To the extent that portions of the district court's opinions below can be interpreted as ruling on the merits of Stagg's constitutional challenges, we vacate those rulings.

**CONCLUSION**

For the foregoing reasons, the plaintiff is not at risk of prosecution under the ITAR licensing scheme. The district court's judgment is VACATED, and Stagg's suit to declare that scheme unconstitutional is DISMISSED for lack of Article III jurisdiction.